JAMES PHILLIP VAUGHNS, State Bar #124040
Law Offices of James Phillip Vaughns
6114 LaSalle Avenue, Ste 289
Oakland, California  94611
Telephone:  510-583-9622
Facsimile:  510-735-8658
vaughnslaw@aol.com

Attorney for Daniel James HARRIS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | NO.:   CR 23-00268 JSW |
| ) | CR-23-00503 JSW |
| Plaintiff,  ) | **SENTENCING MEMORANDUM** |
| vs.  ) | |
| ) | |
| DANIEL JAMES HARRIS,  ) | Date: January 13, 2026 |
| ) | Time: 1:00 p.m. |
| Defendant.  ) | Hon. Jeffrey S. WHITE |

## INTRODUCTION

Defendant Daniel James Harris plead guilty to all counts lodged against him by the Government - the initial steroids-related charges in action 268 and the subsequent fraud charge of action 503. Mr. Harris cooperated with the Government and testified before this Court. The Presentence Report ("PSR") correctly calculates the Total Offense Level as 16, and a Criminal History Category of I, given the absence of any prior criminal activity. The resulting guideline range is 21 to 27 months. The PSR recommends a sentence of probation and that is the request here. Sentencing is scheduled for January 13, 2026 at 1:00 p.m.

**FACTUAL BACKGROUND**

Daniel James Harris is a 38 year old father, ex-husband, and first-time offender. He served in the United States Army, having enlisted in 2010 and being honorably discharged in 2018. He was a Deputy Sheriff for Contra Costa County from 2014 to 2015 and an Antioch Police Officer from 2015 to 2022.

The events leading to the present charges mainly occurred in 2022 after he had suffered a series of physical injuries culminating in the need for spinal surgeries in 2017, 2020, and in 2024.

Mr. Harris entered his guilty pleas on September 17, 2024. He testified in the trial of his co-defendant and guilty verdicts were obtained in 2025.

He faces sentencing now as a recipient of a Bachelor's degree in psychology (graduating cum laude) and a graduate of flight school with diminishing opes of becoming a pilot at some point. These accomplishments were achieved during the pendency of these cases.

This Court has rendered judgment on most of the individuals targeted by the Government's prosecution of the Contra Costa County law enforcement officers. That prosecution was initiated by actions committed by officers other than Mr. Harris, but he was swept up in the ensuing investigation. On the day of the sentencing of Mr. Harris, the Court is likely to conclude that prosecution by sentencing him and the remaining defendants.

With that in mind, it is not the aim of this memorandum to repeat or rephrase what the Court has no doubt read and digested many times before. Counsel is very much aware of the Court's sensitivity to the need for its sentencings in these cases to send messages of deterrence to others. It is the aim of this memorandum, though, to posit the question to the Court: how much punishment of Mr. Harris is enough to accomplish that?

**ARGUMENT**

**District Courts Have Both the Authority and the Responsibility to Exercise**

**Their Judgment and Discretion in Arriving at the Appropriate Sentence**

The Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005),

- 2 -

*Kimbrough v. United States*, 128 S. Ct. 558 (2007), and *Gall v. United States*, 128 S. Ct. 586 (2007), dramatically altered the district court's role in sentencing. The Sentencing Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough*, 128 S. Ct. at 564. While "district courts still 'must consult [the] Guidelines and take them into account when sentencing,'" *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006) (quoting *Booker*, 543 U.S. 264), district courts "may not presume that the Guidelines range is reasonable," *Gall*, 128 S. Ct. at 596-97; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). After *Booker*, "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991 (quoting 18 U.S.C. § 3553(a)). The Guideline range is only one factor for the district court to consider in making this judgment, and it may not be weighed more heavily than any other factor. *Id.*

In *Gall*, the Supreme Court held that appellate courts cannot require that "a sentence that constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances." 128 S. Ct. at 591. The Court likewise rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 595. Rather, it is within the district court's discretion to arrive at an appropriate sentence, "whether inside, just outside, or significantly outside the Guidelines range." *Id.* at 591.

**FACTORS TO BE CONSIDERED IN IMPOSING SENTENCE**

The primary directive in 18 U.S.C. § 3553(a) is for sentencing Courts to impose a sentence which is sufficient, but not greater than necessary, to comply with the above objectives of sentencing. As noted, under *Booker*, sentencing courts must treat the guidelines as just one of

a number of sentencing factors set forth in18 U.S.C. § 3553(a). In determining a minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider certain factors, particularly the following:

**(1) Circumstances of the Offense and Characteristics of the Defendant**

Mr. Harris' childhood is detailed in the PSR and will not be repeated here. The Court should keep in mind though, that very few people find a way to overcome such obstacles and live productive, law-abiding, lives. Mr. Harris did so. That is, until he didn't.

***Physical Problems***

Mr. Harris has suffered physical pain the likes of which few can appreciate. Spinal injuries result in pain that is constant and nearly intolerable, since nearly every bodily movement engages the back to some extent. Relying on steroids to treat his injuries would have been a medically appropriate act - had he been a physician.

He knows he shouldn't have obtained steroids illegally and without a prescription. He most definitely should not have distributed them, regardless of how society turns a blind eye to celebrities who have obviously used steroids solely to launch careers, finding wealth and success

in the process. However, his doing so was not the product of a criminal mind. Misguided, and seeking pain relief, certainly. Criminal - in the malignant heart context - it was not.

The take-away from this aspect of Mr. Harris' characteristics is that he will forever live with physical pain.



### *Collateral Consequences*

As stated, Mr. Harris has not simply sat on his couch awaiting this sentencing. He completed his Bachelor's degree and is continuing towards his Master's degree. He completed flight school.



.

However, he has learned that the FAA is very much unlikely to ever grant licensure to a felon, let alone one with the multiple felonies to which he has plead. In like fashion, other employers who might accept a potential employee with one felony, look askance at one with several.

The Government uses cooperators and the standard script is that a cooperator must "eat" every possible charge before testifying in order to prevent a defense challenge of favoritism or other basis for questioning credibility. Here, Mr. Harris was not charged with the events of the 502 case until he agreed to cooperate. It was no surprise, though, and it was "eaten" so to speak. However, its aftermath is a collateral consequence that he will carry with him going forward - begging the question of how much punishment is truly enough.

### *Family Impact*

Every father who commits a crime and is sentenced affects his children by his original criminal actions. Its not the fault of the Government, nor the Court, that children are affected by a parent's potential incarceration. Whether incarceration is even appropriate, though, is an analysis that necessarily does involve a consideration of its impact on others.



Mr. Harris is the loving father to two great kids, Ryder and Paige. Their mother is currently living with another man and the children confess to Mr. Harris that they prefer the times they spend with him over the times spent at the other household. Incarceration will cost them the healthcare coverage Mr. Harris provides as a family benefit of being a veteran who is 100% disabled. The kids are of the most formative time of their development and the potential separation from them that incarcerating Mr. Harris will cause is a cross he will have to bear. Whether incarceration and the impact on the Harris kids is necessary to advance the aims and goals of sentencing is a question one hopes the Court carefully considers.

### *Public Approbation*

Mr. Harris, through counsel, reached out to the U.S. Attorney's Office in April, 2022 when he first learned he was under investigation. He volunteered a videotaped statement which was accepted and counsel offered to bring him in whenever the Government needed for arrest and processing.

Nevertheless, his door was kicked in a year later at his home in Texas and he was marched in cuffs down the street while his family and neighbors watched. When you break the law, unpleasant things follow. He understands that, and has been on the other side of similar events. However, he (and counsel) thought some degree of "professional courtesy" would have been afforded him given his affirmative reaching out. Required, no. Expected, maybe. Regardless, the impact of these cases truly began when his image of being the ideal neighbor morphed into the image of a federal-level drug dealer.

Police officers are afforded great powers and responsibilities. With those things comes an expectation that they will be deserving of their powers and that they will fulfill those responsibilities with distinction. When they fall short, they face more scrutiny and disdain than civilians. When that happens, there can be an overreaction by the public, the media, and politicians. Again, that goes with the territory and Mr. Harris is not complaining about that fact of life. Public approbation can be taken too far, though, in today's world with the media tending to

pounce on bad police activity and ignore "good news" stories. In a rush to be "first," the media can make glaring mistakes.

[Image: Screenshot of Oakland News Update article with headline "Charges Dropped Against Cops Who Dumped Black Woman's Body In Dumpster, Then Set It Ablaze"]

The above "article" was apparently published on June 13, 2023 and can still be found at: https://newsone.com/4611613/mykaella-sharlman-antioch-police-california-charges-dropped-in-mutilation/

The point being that the blatantly false headline ran on a public website - ringing an untrue bell, but one that is hard to un-ring. Officers everywhere suffered an impact to their public standing in the eyes of those reading this "article." In like fashion, Mr. Harris is tarred and feathered by the actions of other criminally charged officers whose violent and sociopathic actions were far different from his. He will always be "one of those" and that is his cross to bear. How much punishment - here, the public disdain - is enough is the continuing theme of this memorandum and is repeated as a question here.

### *Fraud*

Mr. Harris does not maintain that, because the bank that issued him a mortgage suffered no loss, and because he truly did have the amount of income to which his fraudulent documents attested, he should escape punishment for his actions. He accepted responsibility for ALL of his

actions in these cases and he recognizes that no loss doesn't mean no harm. However, other defendants' actions truly did cause actual harm and human suffering and where incarceration may be appropriate in those other cases, it may not be so obviously necessary here.

### *Community Support*

Mr. Harris has always had the respect and admiration of his community. He retains much of that today. The letters submitted with this memorandum emphasize the writers' understanding that Mr. Harris is a person of character who means well. Many of those writers have greatly benefitted and prospered from his guidance and his moral example. They understand that human beings, however moral, can make bad decisions at times. He has asked his supporters NOT to show up in court. He reasons that he will not impact the lives of others just to help him make an "impression" on the Court by sitting in the audience. Let it not be assumed though, that the absence of supporters in court means he lacks support outside.

### **CONCLUSION**

Mr. Harris stands before the Court recognizing that he broke the law and that punishment must ensue. He stands before the Court at the same time, though, asking that his wrongs be accurately measured. A reasonable sentence in this case will be based on the reality of what he has already lost, what he will never get back, and on the gravity of his rejection of the "thin blue line." He hopes the Court will measure the degree of criminality he actually displayed and balance that with the impact on his family that a period of incarceration will cause.

This Court can be guided by the fact that Mr. Harris has used his time wisely and productively while awaiting judgment. Incarceration is unwarranted in his case. The Court's message to the public has been well received already and imposing probation here will not lessen the magnitude of that message. Anyone in Mr. Harris' position will see that misbehavior of this sort will cost one his/her livelihood and will result in a lifetime impact.

Another aspect of the Court's message to the public will be that, should one transgress, there are benefits to accepting responsibility (as opposed to obstructing the path to justice) and

cooperating with the Government. It would send a mixed message if non-cooperators came out of the prosecution better off than those who opened their lives to dissection on cross-examination in the crucible of a jury trial that resulted in a conviction.

    As set forth above, the circumstances of this case provide the Court with an ample record upon which to impose a sentence of probation.

DATED: January 6, 2026

                                               *-S- James Phillip Vaughns*
                                               _____
                                               JAMES PHILLIP VAUGHNS.
                                               Attorney for Defendant HARRIS