CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ERIC CHENG (CABN 274118)
ALETHEA M. SARGENT (CABN 288222)
Assistant United States Attorneys

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    eric.cheng@usdoj.gov
    alethea.sargent@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>DANIEL JAMES HARRIS,<br><br>    Defendant. | CASE NOS.  4:23-CR-00268 JSW &<br>                      4:24-CR-00502 JSW<br><br>**UNITED STATES' SENTENCING MEMORANDUM AND § 5K1.1 MOTION BASED UPON SUBSTANTIAL ASSISTANCE TO AUTHORITIES** |

I. INTRODUCTION

Defendant Daniel Harris, a police officer with the Antioch Police Department ("APD"), began purchasing illegal anabolic steroids for his own personal use around 2019. He then began selling and distributing these Schedule III controlled substances to numerous other law enforcement officers at APD and neighboring law enforcement agencies. Among others, Harris sold illegal anabolic steroids to fellow APD officer Devon Wenger, and also agreed with Wenger to distribute them to Wenger's friend B.M. Harris' prolific sale and distribution of illegal anabolic steroids continued through March 2022 as he was in the process of moving from California to Texas, only coming to a halt after the FBI executed search warrants that located and seized troves of illegal anabolic steroids from a postal package destined for Harris (including steroids for Wenger's friend), from Harris' California residence, and from Harris' new residence in Weatherford, Texas.

The government's investigation also revealed that Harris' criminal activity while employed as an APD officer was not limited to the purchase and distribution of illegal anabolic steroids: he further committed bank fraud by falsifying information in his application for a mortgage to purchase his Texas residence.

Harris' crimes were particularly serious given Harris' role as a law enforcement officer sworn to uphold the law. However, following his indictment and arrest, Harris took responsibility for his actions and pleaded guilty to all of these crimes, agreed to meet with the government and cooperate, and ultimately testified before the jury as to his and Wenger's conduct involving the distribution of illegal anabolic steroids.

Based on the nature and circumstances of the serious offenses, the defendant's history and characteristics (including his role as a sworn police officer), the need for deterrence, and the need to avoid unwarranted sentence disparities given the sentences already imposed by this Court, as well as the government's motion for the equivalent of a three-level downward departure pursuant to § 5K1.1, the government recommends that the Court impose a sentence of twelve months and a day of custody, followed by three years of supervised release, and 100 hours of community service. This proposed sentence is sufficient, but not greater than necessary, to achieve the goals set forth in 18 U.S.C. § 3553(a)(2).

## II. BACKGROUND

### A. Factual Background

*CR 24-00268-001 JSW*

Daniel James Harris was formerly employed as a police officer with the Antioch Police Department. PSR ¶ 10. Beginning no later than in or about November 2019 and continuing through in or about March 2022, and while employed with the Antioch Police Department, Harris possessed with intent to distribute, and conspired with other persons to distribute, anabolic steroids and other Schedule III controlled substances. PSR ¶ 10. Harris knowingly obtained and possessed anabolic steroids for his own personal use as a competitive bodybuilder. PSR ¶ 10. He also possessed anabolic steroids to distribute to other persons in exchange for payment using electronic payment services such as Venmo and Zelle. PSR ¶ 10.

Harris purchased anabolic steroids and other Schedule III controlled substances from a source located in Florida, who went by the moniker "J.M." PSR ¶ 11. J.M. labeled the anabolic steroids "Trueshot Pharmaceuticals," which was not a legitimate company. PSR ¶ 11. Harris sold and distributed anabolic steroids on many occasions to other law enforcement officers, including Devon Wenger and Timothy Manly Williams at the Antioch Police Department, and those at other police departments. PSR ¶ 11.

Harris knew Wenger because they both worked at the Antioch Police Department, and because Harris purchased his home in Discovery Bay, California from Wenger. PSR ¶ 12. Prior to March 2022, Harris sold Wenger multiple vials of anabolic steroids, including testosterone. PSR ¶ 12. In February 2022, Harris provided Wenger with testosterone and helped Wenger administer the first dose through an intramuscular injection. PSR ¶ 12.

Shortly afterwards, Wenger put Harris in touch with his friend, B.M., so that B.M. could purchase steroids from Harris. PSR ¶ 13. B.M. contacted Harris to talk about fitness and steroids. PSR ¶ 13. Harris then agreed with Wenger to get B.M. a bottle of testosterone. PSR ¶ 13.

Harris subsequently ordered anabolic steroids from his source. PSR ¶ 14. Harris admitted he intended to use some of the anabolic steroids himself and distribute the other steroids to Wenger and B.M. PSR ¶ 14. On March 2, 2022, Wenger contacted Harris and asked if he could pick up B.M.';s

steroids. PSR ¶ 14. However, because Harris still had not received the package from his source, he followed up via email. PSR ¶ 14. The source explained that the package was "taking longer than expected," and provided Harris with the tracking number. PSR ¶ 14.

On March 9, 2022, Wenger again contacted Harris and asked if he could pick up B.M.'s steroids. PSR ¶ 15. Harris responded that the package was still late and sent Wenger the tracking number. PSR ¶ 15. Wenger then asked Harris if he could give B.M. one of his (Wenger's) personal bottles of steroids, and then get his supply replenished when the shipment finally arrived. PSR ¶ 15.

However, the package never arrived because it was seized by the United States Postal Service (USPS). PSR ¶ 16. The seized priority mail package was addressed to a "Danny Moore" at a residence in Discovery Bay, California. PSR ¶ 16. "Danny Moore" was Harris' alias, and the address was Harris' home. PSR ¶ 16. The seized USPS package contained two smaller boxes: one box contained various prescription-type medications, all labeled as having been manufactured by "True Shot Pharmaceuticals." PSR ¶ 16. The second box contained glass vials with three different color caps. PSR ¶ 16.

Lab reports from the Drug Enforcement Administration revealed the package contained 41 capsules of oxymetholone; 124 mL of Testosterone Enanthate; 28.2 mL of Testosterone Propionate; 56.1 mL of Trenbolone acetate; 60 mL of Nandrolone Decanoate; 43 mL of Trenbolone Enanthate; and a total of 16.6 mL of miscellaneous steroids. PSR ¶ 17. Harris admitted that the USPS package contained (1) one sealed black packet with the label "Trueshot Pharmaceuticals; Anadrol-50mg; QTY: 50; Each Capsule Contains: 50mg Oxymetholone," containing at least 2 grams of Oxymetholone; (2) multiple glass vials containing a clear liquid and a gray top, with a label "Trueshot Pharmaceuticals; Test E 300mg; Sterile 10ml multi-dose vial. For intramuscular use only; Testosterone Enanthate" or "Testosterone Cypionate," containing at least 110 grams of Testosterone Enanthate; (3) multiple glass vials containing a clear liquid and a purple top, with a label "Trueshot Pharmaceuticals; Test P 100; Sterile 10ml multi-dose vial. For intramuscular use only; Testosterone Propionate," containing at least 25 grams of Testosterone Propionate; (4) and multiple glass vials containing a yellow liquid and a red top, with a label "Trueshot Pharmaceuticals; Tren A 100; Sterile 10ml multi-dose vial. For intramuscular use only; Trenbolone Acetate," containing at least 55 grams of Trenbolone Acetate. PSR ¶ 17. In total,

this amount of steroids (192 grams) equates to 7,680 units of Schedule III controlled substances using the conversion instructions outlined in USSG § 2D1.1, comment (n.F). PSR ¶ 17.

On or about March 23, 2022, Harris possessed anabolic steroids and other controlled substances at his home in Discovery Bay, California, including: at least 60 grams of Trenbolone Enanthate; at least 10 grams of Trenbolone Acetate; at least 25 grams of Testosterone Acetate; at least 15 grams of Testosterone Propionate; at least 25 grams of Testosterone Cypionate; at least 50 grams of Nandrolone Decanoate; at least 25 grams of Nandrolone Phenylpropionate; at least 50 grams of Drostanolone Enanthate; at least 70 grams of Drostanolone Proprionate; at least 65 grams of Boldenon Undecylenate; at least 15 grams of Oxandrolone; at least 10 grams of Methandienone; at least 5 grams of Oxymetholone; and at least 5 grams of Stanozolol. PSR ¶ 18. On the same date, Harris also possessed at least 15 grams of Testosterone Cypionate at his home in Weatherford, Texas. PSR ¶ 18. These amounts of steroids equate to 17,800 units of Schedule III controlled substances using the conversion instructions outlined in USSG §2D1.1, comment. (n.F). PSR ¶ 18.

*CR 24-00502-001 JSW*

In February 2022, Harris knowingly supplied inaccurate information to a financial institution in connection with his application for a mortgage. PSR ¶ 19. During this time, Harris applied for, and subsequently received, a $494,000 loan from Mortgage Financial Services LLC with the intent to defraud the financial institution to purchase a residence on Coldwater Creek Lane in Weatherford, Texas. PSR ¶ 19.

Harris provided false information in and omitted material facts from his application. PSR ¶ 20. Specifically, in support of his application, he included at least three falsified documents. PSR ¶ 20. First, Harris falsified and attached a summary of disability benefits purportedly issued by the Standard Insurance Company. PSR ¶ 20. Second, Harris falsified and attached a tax disclosure purportedly issued by the Standard Insurance Company. PSR ¶ 20. Third, Harris falsified and attached a rental agreement purporting to show that a friend, G.S., had rented his home in Discovery Bay, California for $3,400 per month. PSR ¶ 20. Although Harris and G.S. had discussed that possibility, G.S. had not in fact rented the property. PSR ¶ 20. Harris created the signature on the agreement in G.S.'s name and Harris did not actually receive any rental income from G.S. PSR ¶ 20.

### B. Procedural History

Harris was charged on August 16, 2023, in a four-count Indictment with violations of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(E)(i) – Conspiracy to Distribute and Possess with Intent to Distribute Anabolic Steroids (Count One); 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(E)(i) – Attempted Possession with Intent to Distribute Anabolic Steroids (Count Two); 21 U.S.C. §§ 841(a)(1) and (b)(1)(E)(i) – Possession with Intent to Distribute Anabolic Steroids (Count Three). In the same Indictment, Devon Wenger was charged with violations of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(E)(i) – Conspiracy to Distribute and Possess with Intent to Distribute Anabolic Steroids (Count One) and 18 U.S.C. § 1519 – Destruction, Alteration, and Falsification of Records in Federal Investigations (Count Four).

On September 13, 2024, Harris was charged by Information with violating 18 U.S.C. § 1344(1), (2) – Bank Fraud.

On September 17, 2024, Harris pleaded guilty to Counts One through Three of the Indictment, and pleaded guilty to the Information's sole charge. Sentencing is currently set for January 13, 2026, at 1:00 p.m., before the Honorable Jeffrey S. White, Senior United States District Judge.

### C. Criminal History

Harris has no criminal convictions resulting in any Criminal History Points, placing him in Criminal History Category I. *See* PSR ¶¶ 49–55.

### D. Guidelines Calculation

The government agrees with the Sentencing Guidelines calculation of the United States Probation Office, prior to any motion by the government under § 5K1.1. PSR ¶¶ 28-47.

In sum, the base offense level of Count Group 1 is 16, pursuant to U.S.S.G. § 2D1.1(a)(5), (c)(12). The base offense level of Count Group 2 is 7, pursuant to U.S.S.G. § 2B1.1(a)(1), and a twelve-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(G) applies because the calculated loss amount was more than $250,000 and less than $550,000. Following a multiple count adjustment, the Combined Offense Level is 21. A three-level reduction pursuant to U.S.S.G. § 3E1.1 applies based on the defendant's Acceptance of Responsibility, and another two-level reduction pursuant to U.S.S.G. §4C1.1(a) and (b) applies because the defendant is a zero-point offender.

An offense level of 16 with a Criminal History Category I yields an advisory sentencing range of

**21 to 27** months of imprisonment.  PSR ¶ 78.

E.      **Timeline of Convictions and Sentencings in the Related Antioch & Pittsburg Cases**

The status of sentencing of the defendants in these related cases is as follows:

- <u>Timothy Manly Williams</u> – *pleaded guilty on November 28, 2023 to falsification of records, obstruction of official proceedings, and deprivation of rights under color of law; sentencing pending;*

- <u>Samantha Genoveva Peterson</u> – pleaded guilty on January 9, 2024 to conspiracy to commit wire fraud; sentenced to time served, 3 years of supervised release, 100 hours of community service;

- <u>Patrick James Berhan</u> – pleaded guilty on March 26, 2024 to conspiracy to commit wire fraud, wire fraud, and possession with intent to distribute anabolic steroids; sentenced to 30 months of custody, 2 years supervised release;

- <u>Ernesto Mejia-Orozco</u> – pleaded guilty on June 11, 2024 to conspiracy to commit wire fraud and wire fraud; sentenced to 3 months of custody, 3 years of supervised release, 100 hours of community service;

- <u>Brauli Jalapa Rodriguez</u> – pleaded guilty on June 25, 2024 to conspiracy to commit wire fraud and wire fraud; sentenced to 3 months of custody, 3 years supervised release, 100 hours of community service;

- <u>Amanda Carmella Theodosy a/k/a Nash</u> – pleaded guilty on July 30, 2024 to conspiracy to commit wire fraud and wire fraud; sentenced to 3 months of custody, 3 years supervised release, 50 hours of community service;

- <u>Morteza Amiri</u> – convicted at trial on August 8, 2024 for conspiracy to commit wire fraud and wire fraud, and convicted at trial on March 14, 2025 for deprivation of rights under color of law and falsification of records; sentenced to 84 months of custody, 3 years supervised release;

- <u>Daniel James Harris</u> – *pleaded guilty on September 17, 2024 to conspiracy to distribute and possess with intent to distribute anabolic steroids, attempt and possession with intent to distribute anabolic steroids, and bank fraud; sentencing pending;*

Case 4:23-cr-00268-JSW   Document 262   Filed 01/06/26   Page 8 of 12

- *Eric Allen Rombough – pleaded guilty on January 14, 2025 to conspiracy against rights and deprivation of rights under color of law; sentencing pending;*
- Devon Christopher Wenger – convicted at trial on April 30, 2025 for conspiracy to distribute and possess with intent to distribute anabolic steroids and destruction of records, and convicted at trial on September 18, 2025 for conspiracy against rights; sentenced to 90 months of custody, 3 years supervised release.

## III. DISCUSSION

### A. Applicable Law

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991–93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Under U.S.S.G. § 5K1.1, upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, a sentence that is below the otherwise applicable guideline range may be appropriate. The

U.S. SENTENCING MEMO
4:23-CR-00268 JSW & 4:24-CR-00502 JSW                8

appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

>   (1)   the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
>   (2)   the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
>   (3)   the nature and extent of the defendant's assistance;
>
>   (4)   any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and
>
>   (5)   the timeliness of the defendant's assistance.

**B.   Substantial Assistance to Authorities and Motion for Variance Under § 5K1.1**

The government moves the Court pursuant to § 5K1.1 for a variance that is the equivalent of a three-level downward departure based on Harris' substantial assistance to authorities.[1]

Following the FBI's execution of search warrants of Harris' property, Harris demonstrated an immediate interest in resolution. Harris first met with the government in October 2023, within about two months of his indictment. He then met again with the government in July 2024, accepting responsibility for the crimes he was charged with and additional crimes involving bank fraud. He ultimately agreed to cooperate with the government and pleaded guilty to all charges in September 2024, well in advance of the trial of fellow APD officer Devon Wenger at which he would testify.

Harris' testimony was significant. Although the other evidence against Wenger was

---

[1] Although departures have been removed from the Sentencing Guidelines as of the 2025 amendments, including with respect to § 5K1.1, the government's motion is still made in the context of a "departure" to implemented as a variance, given that the Guidelines describe the intent of the change to actually be "outcome neutral." *See* U.S.S.G. § 1 ("The Commission sought to make these changes to better align the requirements placed on the court and acknowledge the growing shift away from the use of departures provided for within the Guidelines Manual in the wake of *Booker* and subsequent decisions. **The Commission envisioned and framed this 2025 amendment to be outcome neutral.** As such, the removal of departures from the Guidelines Manual does not reflect a determination by the Commission that the rationale underlying the deleted departure provisions is no longer informative or that a court should no longer consider such facts for purposes of determining the appropriate sentence. **The removal of departures does not limit the information courts may consider in imposing a sentence and it is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance** under 18 U.S.C. § 3553(a)." (emphases added)).

straightforward—including documentary evidence seized from digital devices coupled with the actual anabolic steroids from the anticipated postal package, along with the live testimony of Wenger's friend—Harris offered additional insight from the perspective of a police officer willing, unlike Wenger, to admit his errors. Harris' testimony also corroborated each of these numerous sources of evidence and made clear that Wenger's accusations and allegations to the contrary were completely unfounded.

Harris was also truthful. While it was evident during several of his meetings with the government that his interpretation of his own behavior at times differed from the government's—such as in his insistence, repeated in the PSR, that he was concerned to help others—he nonetheless accepted full responsibility for his actions.

Following his agreement to cooperate, Harris also met with the government when he was asked to, flying from Texas to Oakland for one trial preparation meeting and attending another by videoconference. He testified at trial for approximately three hours.

Harris' cooperation included some risk as well: as with any police officer who testifies against another, what Harris did was not easy. He made admissions about his own criminal conduct and that of a fellow officer on the stand, and his cooperation is now in the public record.

Based on Harris' substantial assistance to authorities, as set forth above, the government moves this Court for a variance that is the equivalent of a three-level downward departure pursuant to § 5K1.1. This variance would result in an offense level of 13, which with a Criminal History Category I yields an advisory sentencing range of **12 to 18** months of imprisonment.

C. **Recommendation**

The government respectfully recommends that the Court impose a sentence of twelve months and a day of custody—at the low end of the post-variance Guidelines range—followed by three years of supervised release and 100 hours of community service, based upon a consideration of the Guidelines, 18 U.S.C. § 3553(a), and § 5K1.1 factors.

Harris' history and characteristics support the government's recommended sentence. Like the other defendants in these related cases, Harris was a public servant sworn to uphold the rule of law when he broke it. Unlike some of the others charged, however, his crime was not committed under color of law, nor did he defraud his own police department. But his crimes were still serious: he used illegal

anabolic steroids while employed as a police officer, and he distributed these steroids to other officers he knew would utilize those controlled substances in the line of duty. This behavior was not only illegal but also highly irresponsible, given it is well known that the use of steroids can diminish impulse control and increase hostility, aggression, and violent behaviors,[2] consequences that could only be even more dangerous in a law enforcement context. And his outright forgery of documents to obtain his Texas mortgage showed certain hypocrisy by a sworn officer whose role was to enforce the law against such crimes.

The government's recommended sentence would also serve as general deterrence to others in positions of public trust—particularly sworn police officers—from committing such crimes, and especially acknowledge the risks associated with steroid abuse or other distribution of controlled substances by those in positions of public trust. As with the other defendants in these related cases, this Court's sentence should send a message to those who also may be tempted to commit such crimes.

The government's recommended sentence would also avoid sentencing disparities with defendants who have been found guilty of similar conduct. To assist the Court's consideration of sentencing parity, the government has, above, detailed for the Court all prior sentences in these related cases. For instance, Patrick Berhan similarly pleaded guilty to violations involving the distribution of anabolic steroids and fraud (a different scheme involving defrauding his employer), but he did not cooperate with or provide any assistance to the government; he was sentenced to 30 months of imprisonment.

The government also acknowledges that Harris' family history—including poverty, neglect, and abuse that permeated his childhood—in some ways provides context for the poor choices he has made with the offense conduct. As Harris notes in his attempt in the PSR to explain his crimes, "[m]y intent was never malicious." PSR ¶ 24. Of course, this is not the test of legality, but Harris' difficult childhood offers some insight into an inability to differentiate between what he calls the "letter" and "spirit" of the law, and his misguided approach to "helping" people. *See* PSR ¶ 24. For this reason, the government recommends a sentence at the low end of the post-variance Guidelines range.

---

[2] *See, e.g.*, https://pmc.ncbi.nlm.nih.gov/articles/PMC8211877/.

Finally, the government recommends that the Court order a three-year term of supervised release for Harris with the conditions recommended in the PSR, as well as with the same 100 hours of community service that this Court also required of other defendants including Peterson, Mejia-Orozco, and Jalapa Rodriguez. The expanded suspicionless search condition agreed to by the parties is appropriate to serve the interests of specific deterrence and rehabilitation given Harris' use of electronic devices in carrying out his crimes.

## IV.   CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of twelve months and a day of imprisonment, followed by three years of supervised release with the agreed-upon expanded suspicionless search condition and other conditions recommended in the PSR, and 100 hours of community service.

DATED: January 6, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

_____/s/_____
ERIC CHENG
ALETHEA M. SARGENT
Assistant United States Attorneys